JENNIFER D. REECE (Tex. Bar No. 00796242)
*PRO HAC VICE* APPLICATION PENDING
Attorney for Plaintiff
U.S. Securities and Exchange Commission
801 Cherry Street, Suite 1900, Unit 18
Fort Worth, Texas 76102
Email: ReeceJ@sec.gov
Phone: 817-978-6442
Fax: 817-978-4927

Local Counsel:
LYNN M. DEAN (Cali. Bar No. 205562)
U.S. Securities and Exchange Commission
444 South Flower Street, Suite 900
Los Angeles, California 90071
Email: DeanL@sec.gov
Phone: 323-965-3245
Fax: 213-443-1904

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### SOUTHERN DIVISION

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **Case No. 8:19-cv-499** |
| **Plaintiff,** | **COMPLAINT** |
| vs. | |
| **KENT R.E. WHITNEY, DAVID LEE PARRISH, THE CHURCH FOR THE HEALTHY SELF A/K/A CHS TRUST, AND CHS ASSET MANAGEMENT INC.,** | |
| **Defendants.** | |

Plaintiff Securities and Exchange Commission ("Commission" or "SEC") alleges:

## JURISDICTION

1. The Commission brings this action pursuant to the authority conferred

1

1  upon it by Section 21(d) of the Exchange Act [15 U.S.C. §78u(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

2. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), (e) and 78aa].

3. Venue is proper in this Court pursuant to Section 22(a) of the Securities Act and Section 27 of the Exchange Act [15 U.S.C. §§ 77v(a) and 78aa]. Certain of the transactions, acts, practices, and courses of business described herein occurred within the jurisdiction of the Central District of California.

4. In connection with the transactions, acts, practices, and courses of business described in this Complaint, the Defendants, directly and indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the means and instruments of transportation or communication in interstate commerce.

## SUMMARY

5. Defendants Pastor Kent R.E. Whitney and Pastor David Lee Parrish are running at least a $25 million Ponzi scheme targeting primarily the Vietnamese community of Orange County, California, through their purported church, The Church for the Healthy Self, a/k/a CHS Trust ("CHS"), and a related entity, CHS Asset Management Inc. ("CAM"), which are both Texas corporations operating out of a strip mall in Westminster, California. Using presentations, radio and television advertisements, and YouTube videos, the defendants falsely promise investors, among other things, at least 12% annual returns that are tax-deductible, guaranteed, and insured by the FDIC and SIPC. Whitney founded The Church for the Healthy Self three months after being released from federal prison for defrauding investors in a scheme assisted by Parrish, a fact Defendants

concealed from potential investors.

6.  Defendants lured investors by promising to open investor accounts on their behalf "under the CHS Trust umbrella of non-profit" that would provide "safe and secure growth," offering market upside without exposing investors to market declines or any loss of principal.  CHS promised investor money would grow tax free, and told investors that CHS would donate a portion of an investor's profits to their choice of charities.  CHS explained to investors that it was able to generate high returns—as high as 43% annually —with "minimal to no risk" by investing their funds in the reinsurance industry.  Whitney assured investors they would only lose money in the event of a "nuclear war."  CHS also assured investors that they would have access to their money for major purchases, such as cars and vacations.  CHS told investors it was not a Ponzi scheme, but is managed by Wall Street investors, audited by KPMG, and is a "well-run company that brings big returns" to its investors.

7.  These assurances are false.  In reality, CHS does not invest the money or donate to charity.  KPMG has no current or past business relationship with CHS or any related entities or individuals.  Investors write checks or rollover retirement, investment, or college savings assets to CHS and CAM bank accounts where the funds are commingled.  The majority of funds deposited into the CAM bank account are then transferred to CHS.  The vast majority of those funds were misappropriated by the Defendants, who enriched themselves and paid their personal expenses and made Ponzi payments to investors—satisfying investors' liquidation requests with recent deposits of new investors.  There is no evidence of any underlying investment vehicle as Defendants promised investors.

8.  The scheme is ongoing, and investor funds are at risk.  As recently as March 6, the Defendants have withdrawn large sums of money from a known bank account.  In addition, CHS continues to solicit new investors in person and

online.

9. By committing the acts alleged in this Complaint, the Defendants directly and indirectly engaged in, and unless restrained and enjoined by the Court will continue to engage in, acts, transactions, practices, and courses of business that violate the anti-fraud provisions of the federal securities laws, specifically Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

10. The SEC brings this civil enforcement action seeking permanent injunctions, disgorgement plus pre-judgment and post-judgment interest, and civil penalties as to each Defendant, and all other equitable and ancillary relief to which the Court determines the Commission is entitled.

## DEFENDANTS

11. **The Church for the Healthy Self a/k/a CHS Trust ("CHS")** is a Texas nonprofit corporation, incorporated on September 11, 2014, whose principal place of business is 3131 McKinney Ave., Suite 600, Dallas, TX 75204. CHS operates primarily at 14082 Magnolia Street, Suite 206, Westminster, CA 92683. CHS raises investor funds through purported donations to its CHS Trust investment program. Neither CHS nor any CHS securities are registered with the Commission.

12. **CHS Asset Management Inc. ("CAM")** is a Texas for-profit corporation, incorporated on September 20, 2017. Its principal place of business and the address where it primarily operates are the same as CHS. Neither CAM nor any CAM securities are registered with the Commission.

13. **Kent R.E. Whitney** is a 37 year-old resident of Orange County, California. He is a director of CHS. He holds himself out to be a "pastor" of CHS, and the founder and CEO of CHS Trust.

14. **David Lee Parrish** is a 47 year-old resident of Orange County, California. He holds himself out to be a pastor of CHS and the director of CHS Trust.

## FACTUAL ALLEGATIONS

A. **The Fraudulent History of Whitney and Parrish.**

15. Before becoming pastors, Whitney and Parrish were fraudsters. On August 29, 2003, Whitney was registered with the Commodity Futures Trading Commission ("CFTC") as a floor broker. From May 2008 through April 2010, Whitney engaged in a scheme to avoid posting more than $96 million of margin calls when placing orders for commodity options traded on the New York Mercantile Exchange and the Chicago Mercantile Exchange. The CFTC sued Whitney on December 10, 2010, and obtained a consent order against him on May 22, 2012, permanently barring him from the commodities industry and imposing a $600,000 civil penalty.

16. CME Group owns four Designated Contract Markets—Chicago Mercantile Exchange, Chicago Board of Trade, New York Mercantile Exchange, and Commodity Exchange. Whitney was the subject of three CME Group trading suspensions during 2010—one for 60 days and two for six months—related to the margin call fraud.

17. CME Group also imposed two six-month trading suspensions on Parrish for assisting Whitney's scheme. The first order found that Parrish had placed options orders, for Whitney's benefit, creating a margin debt of more than $40 million when Parrish had no financial means to satisfy the obligation. The second action determined that Whitney and Parrish, while subject to the prior trading suspension, solicited investor funds for the purpose of trading at CME Group exchanges, as well as investing in a business operated by them whose purpose was to trade at CME Group exchanges. Whitney and Parrish promised

5

high returns, but instead dissipated the investors' money without investing the funds.

18. In September 2011, Whitney pled guilty to one count of wire fraud in connection with the margin call fraud scheme. *See United States v. Whitney,* Case No. 1:11-cr-108 (N.D. Ill. [Eastern Div.]). As part of his scheme, he obtained more than $600,000 from approximately 10 investors for a purported commodity pool investment and for trading in futures accounts to be held jointly between Whitney and the investors. He misrepresented the use of investor funds, investor returns, and the investment's risk. Whitney misappropriated most of the money he received, generated bogus account statements, and made Ponzi payments. On December 8, 2011, Whitney was sentenced to 44 months imprisonment. Whitney was released from federal custody in June 2014.

**B.  Undeterred by Prison, Whitney Establishes a Church to Defraud More Investors.**

19. In August 2014, Whitney became an ordained minister through an on-line program. A month later, Whitney formed CHS, purportedly as a nonprofit, religious organization. CHS's websites provide the facade of a "virtual church." For example, they provide links to YouTube channels offering religious videos and online prayer requests forms. But CHS does not hold religious services typically associated with churches. The primary mission of the church appears to be obtaining investor funds.

20. Whitney and Parrish reprised their partnership in 2018 when Parrish joined CHS as a pastor, and as the director of CHS Trust.

21. CHS mass markets its CHS Trust investment program to the public on its websites, including www.churchforthehealthyself.org, and heavily advertises its program on Vietnamese radio and television stations in Orange County,

California. One such CHS television commercial, in Vietnamese with English subtitles, states: "Hello, I would like to introduce you to an investment program earning 12% interest from CHS Trust. Safe, effective, and insured by FDIC and SIPC. CHS Trust investment program gives you higher interest than 401K or IRA with maximum tax benefits. Register for a free seminar to learn about the 12% interest rate program at CHS Trust every Wednesday at 6pm." A screenshot from the commercial is included below:

```
03-26-2018     Withdrawal ACH Kent Whitney AMEX EPAYMENT-ACH PMT M5816     $39,595.24
               (S)
```

### C. Misrepresentations to Investors

#### 1. Investor A

22. One prospective investor, Investor A, considered investing in CHS Trust after hearing about it through an advertisement targeting the Vietnamese community. Investor A had gone to CHS's Westminster, California, office to discuss investing. While there, she received documents describing the CHS Trust investment program, which she sent to her financial advisor to review. The offering documents CHS provided made several false or misleading claims regarding the CHS Trust investment program, including:

- CHS was a tax-exempt charity under Section 501(c)(3) of the Internal Revenue Code;
- CHS Trust would provide tax receipts to investors reflecting that their investments were donations to CHS for which they received no goods or services in exchange;
- The CHS Trust investment program offered high-yield returns and "maximum income tax benefits for individuals and businesses, higher than 401K or IRA, and completely legal;"
- CHS Trust investments were "FDIC insured up to $250K plus SIPC $500K per member;"

7

- Investment accounts would be opened on their behalf "under the CHS Trust umbrella of non-profit" that would provide "safe and secure growth," offering market upside without exposing investors to market declines;
- CHS was able to generate high returns for investors, with "minimal to no risk," by investing their funds in the reinsurance industry;
- CHS would donate a portion of an investor's profits to their choice of charities;
- Investors would have access to their money for major purchases, such as cars and vacations;
- CHS guaranteed that investors would receive annual returns of no less than 12% and that 100% of all principal would be returned to them;
- In "A Message from the CEO," Whitney stated that "ongoing client referrals are what makes our family stronger each and every month…and what helps us continue seeing the strong returns we've been seeing, month-over-month. [] We have set up a new, cutting-edge strategy/methodology on how we invest our donations into the same Trust that has been bringing you **above-market returns…**so that your donations grow and have even MORE of an impact to your favorite charities."

23. CHS also provided Investor A with a retirement account transfer form. The document instructed current IRA custodians and plan administrators to transfer investor funds by check, payable to CAM at the same office address as CHS's Westminster office. In this form given to prospective investors, CAM represented that it would create an IRA and act as custodian over retirement assets.

24. During a July 20, 2018 meeting at Investor A's home attended by

several potential investors, Whitney stated that CHS Trust investments are fully tax-deductible. He also promised a minimum 12% annual return. Whitney claimed that CHS Trust generated the guaranteed returns through reinsurance investments and options trading. Whitney said that CHS Trust investments were insured and boasted that only "nuclear war" could prevent investors from receiving the promised returns—the same line he had used to pitch at least one of the victims of his prior investment scheme. Whitney did not disclose his criminal or regulatory background during the meeting, but instead boasted of his great financial success. After the meeting, the financial advisor and Investor A concluded that CHS Trust was likely a Ponzi scheme and declined to invest.

### 2.     *Misrepresentations on YouTube*

25.    In a video, published to CHS Trust's YouTube channel on January 3, 2019, Parrish pitches CHS Trust investments as being tax deductible with 12% guaranteed annual returns. In a series of videos, published to the YouTube channel of a Vietnamese television station based in Orange County between November 2018 and February 2019, Parrish makes the following misrepresentations regarding CHS Trust:

- CHS Trust's risk is "so minimal" because each investor account is protected by up to $250,000 of FDIC insurance and up to $500,000 of SIPC insurance;
- CHS Trust offers "unheard of" returns which averaged approximately 2.5% per month for the preceding five years;
- CHS Trust employs a "specific proprietary investment strategy" that has resulted in "huge successes;"
- CHS Trust is "safer than any other investment;"
- Parrish has years of experience trading at the Chicago Board of Trade and the Chicago Mercantile Exchange;

9

- CHS Trust had a record year in 2018, paying its investors a 36.27% annual return which equated to approximately a 43% compounded annual return;
- CHS Trust is not a Ponzi scheme, but is managed by Wall Street investors, audited by KPMG, and is a "well-run company that brings big returns" to its investors; and
- CHS Trust's worst month, January 2015, produced a 1.5% return.

26. In fact, KPMG has no current or past business relationship with CHS or any related entities or individuals.

D. **FBI Seizure of CHS Account Funds**

27. The Defendants misused almost all of the roughly $25 million raised from investors. For example, the CHS bank records reflect approximately $25 million of deposits and $21 million of withdrawals between January 2018 and February 2019. The account balance at the end of February 2019 was approximately $4.1 million.

28. On March 4, 2019, the FBI sought and obtained a criminal seizure of the funds in the main CHS bank account. The seizure warrant cited potential violations of federal wire fraud and money laundering statutes as the predicate for the seizure. *In re the Seizure of All Funds in Prestige Community Credit Union for Member No. 95803, Account No.950,* Case No. 8:19-MJ-136 (Early, M.J.).

29. CHS's bank records show that CHS's source of "income" consisted of investor funds. For example, during December 2018 and January 2019, approximately $4.4 million in investor funds was deposited into the bank account, primarily in large, round number transactions. Most of the checks are from individuals with Asian names.

30. During the same two months, CHS withdrew approximately $4 million from the account and dispersed it to enrich Whitney and Parrish, pay their

10

personal expenses, and to make Ponzi payments to investors. During those two months, CHS paid almost $2.7 million to American Express and $755,000 to a mortgage lender. CHS spent an additional $236,000 on credit card bills, student loans bills, and rent, and at least one "commission" check for more than $50,000.

31. No investment activity occurred in the account as was promised by Defendants.

### E. Misuse of Investor Funds in CAM Account

32. Between January 1 and March 8, 2019, CHS Trust investors transferred approximately $7.1 million to CAM, frequently through rollovers of existing retirement accounts induced with the promise that CAM would act as the custodian of a CHS Trust IRA established on their behalf. CAM sent roughly $6.3 million of that amount directly to CHS's bank account. The balance was diverted to uses inconsistent with investment activities. For example, CAM used investor funds to pay title and mortgage companies, jewelers, and a home staging and interior design firm.

### F. Ongoing Fraudulent Activity

33. Despite the FBI seizure of CHS's bank account, Defendants have continued to solicit investors.

34. On March 6, CAM closed one of its accounts at Bank of America, and withdrew approximately $122,000 of investor funds.

35. On March 9, CAM withdrew $400,000 of investor funds from a Bank of America account.

36. The FBI seized the remaining funds in the account on March 12, 2019.

# CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### Fraud – Violations of Section 10(b)
### of the Exchange Act [15 U.S.C. § 78j(b)] and
### Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder

37. Plaintiff repeats and incorporates by reference paragraphs 1 through 34 of this Complaint as if set forth *verbatim* herein.

38. Each Defendant, by engaging in the conduct described above, directly or indirectly, with *scienter*, in connection with the purchase or sale of securities, and by use of the means and instrumentalities of interstate commerce the mails, or any facility of a national securities exchange, has: (a) employed a device, scheme or artifice to defraud; or (b) made an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in an act, practice, or course of business that has operated or will operate as a fraud or deceit upon other persons.

39. By engaging in the conduct described above, each Defendant violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5thereunder [17 C.F.R. § 240.10b-5].

## SECOND CAUSE OF ACTION

### Fraud –Violations of Section 17(a)
### of the Securities Act [15 U.S.C. § 77q(a)]

40. Plaintiff repeats and incorporates by reference paragraphs 1 through 34 of this Complaint as if set forth *verbatim* herein.

41. Each Defendant, directly or indirectly, in the offer or sale of securities, and by use of the means and instrumentalities of interstate commerce

the mails, or any facility of a national securities exchange, has: (a) employed a device, scheme, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact and omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in a transaction, practice, or courses of business which operates or would operate as a fraud and deceit upon the purchaser.

42. With respect to violations of Sections 17(a)(2) and (3) of the Securities Act, Defendants were negligent in their actions regarding the representations and omissions alleged herein. With respect to violations of Section 17(a)(1) of the Securities Act, Defendants acted knowingly or with severe recklessness regarding the truth.

43. For these reasons, Defendants each have violated and, unless enjoined, will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

(1) Enter an Order finding that Defendants committed, and unless restrained will continue to commit, the violations alleged in the Complaint;

(2) Permanently enjoin Defendants from future violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5] and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

(3) Order Defendants to disgorge all ill-gotten gains from the conduct alleged herein, with prejudgment interest;

(4) Order Defendants to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

1       (5)    Grant such other and further relief as the Court may deem just and
2 proper.

4 Dated: March 13, 2019

5                                                        */s/ Lynn M. Dean*

6                                                        Lynn M. Dean
7                                                        Attorneys for Plaintiff
                                                       Securities and Exchange Commission